IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § § § | |
| CAPCO ENERGY, INC., f/k/a AMCO PETROLEUM, INC. | § § § | CASE NO. 08-32282 |
| TAX ID. NO. 84-0846529 | § § § | |
| CAPCO ASSET MANAGEMENT, INC. | § § § | CASE NO. 08-32283 |
| TAX ID. NO. 33-0874100 | § § § | |
| CAPCO OPERATING CORPORATION | § § § | CASE NO. 08-32284 |
| TAX ID. NO. 20-0120017 | § § § | |
| AMCO ENERGY, INC., f/k/a CAPCO OFFSHORE, INC. | § § § § | CASE NO. 08-32285 |
| TAX ID. NO. 43-1967164 | § § § | |
| CAPCO OFFSHORE OF TEXAS, INC. f/k/a AMCO OFFSHORE, INC. | § § § § | CASE NO. 08-32286 |
| TAX ID. NO. 20-5376533 | § § § | |
| PACKARD GAS COMPANY f/k/a AMCO OIL COMPANY | § § § § | CASE NO. 08-32288 |
| TAX ID. NO. 75-2436530 | § § § | |
| SOLANO WELL SERVICES, LLC | § § § | CASE NO. 08-32289 |
| TAX ID. NO. 06-1742286 | § § § | |
| Debtors | § § | (JOINT ADMINISTRATION REQUESTED) |

**AFFIDAVIT OF MIKE MYERS IN SUPPORT OF FIRST DAY MOTIONS
AND JOINT ADMINISTRATION**

**Mike Myers, being duly sworn, deposes and says:**

1.      On April 4, 2008 (the "Petition Date"), **Capco Energy, Inc. f/k/a Amco Petroleum, Inc., Capco Asset Management, Inc., Capco Operating Corporation, Amco Energy, Inc. f/k/a Capco Offshore, Inc., Capco Offshore of Texas, Inc. f/k/a Amco Offshore, Inc., Packard Gas Company f/k/a Amco Oil Company, and Solano Well Services, LLC**, (collectively, "Capco et al" or, the "Debtors") the Debtors and Debtors-in-Possession in the above-captioned case commenced a case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in this Court. I am the President each of the captioned entities.  As such, I am familiar with the day-to-day operations, business and financial affairs of the Debtors.

2.     The Debtors continue to operate their businesses and manage their properties as debtors-in-possession, pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3.     I submit this affidavit to assist the Court and other parties-in-interest in understanding the circumstances that compelled the commencement of these Chapter 11 cases and in support of the first day motions and applications (the "First Day Motions"). Except as otherwise indicated, all facts set forth in this affidavit are based upon my personal knowledge, information provided to me by certain of the Debtors' employees, my review of relevant documents or my opinion based upon my experience, knowledge and information concerning the operations and financial affairs of the Debtors.  If I were called upon to testify, I would testify competently to the facts set forth in this affidavit.  I am authorized to submit this affidavit.

### BACKGROUND AND EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

4.      Concurrently with the filing of their Chapter 11 Petitions, the Debtors filed the First Day Motions.  The Debtors request that the relief requested in each of the First Day Motions described below be granted, as each request for relief constitutes a critical element in achieving the successful rehabilitation and reorganization of the Debtors for the benefit of all parties-in-interest.

### The Debtor's Business and Facts in Support of First Day Motions

(A).    **Capco Energy, Inc. f/k/a Amco Petroleum, Inc. ("Capco")** is an oil and gas exploration and production company with both onshore and offshore operations.  Capco commenced its offshore operations in December 2003 after the acquisition of the Brazos 440 field in Texas state waters in the Gulf of Mexico ("GOM").  Since then, Capco has continued to acquire additional properties in the GOM.  The most recent acquisition, in September 2006, was for a contracted acquisition cost of $83.0 million, consisting of 17 wells which were producing about 17.0 mmcf at the time of the acquisition.  The acquisition was funded by equity raised via third party partners, production credits from operations and bank debt from Union Bank of California, N.A. ("UBOC").

(B).    Regarding onshore operations, Capco has varying interests in some 270

wells located in Oklahoma and Texas. Current production from these operations is about 60 bopd from 10 producing wells.

(C). The Debtors have 6 full-time salaried or contract employees who perform the daily operating, legal and financial tasks related to the oil and gas properties. Currently the on-site operations of the properties are performed by third party contract operators. Capco's estimated discounted proved reserves as of year end 2006 were $17.0 Million, and the year end reserves as of 2007 are predicted to be in excess of $30.0 Million.

(D). Capco's Onshore Activities are summarized below;

(i) Caplen Field, Galveston County, Texas

This is a 1,900-acre field onshore in Galveston County that has already produced 19 million barrels of oil and 35 BCF of gas from various miocene sands over an 8,000' interval. Current gross production is approximately 40 bopd from 2 wells. Capco has a 61.0% working interest in this field.

(ii) Slick Waterflood Unit, Creek County, Oklahoma

This unit consists of 2,700 acres located in Creek County, Oklahoma. Capco acquired 50% of this unit and assumed operations in October 2004. The unit is comprised of approximately 100 wells evenly split between producing and injection wells. The production from the field is currently limited. Capco's goal is to restore the unit to a production level of approximately 200 bopd.

(iii) Bandwheel Unit, Osage County, Oklahoma

Capco owns 100% of this field comprised of 1,200 acres located in Osage County, Oklahoma. The field contains approximately 80 well bores, which are not presently in service with current production. When fully restored, the field is expected to produce in excess of 100 bopd. Studies indicate that by utilizing horizontal wells (due to the vertical fracturing of the Bartlesville sand), the Bartlesville sand could be effectively water flooded, thereby greatly increasing the amount of recoverable reserves and the corresponding value of the field. In addition, it has been noted that one well drilled to the Arbuckle formation produced approximately 45 bopd with little or no stimulation, before being perforated lower in the Arbuckle and utilized as a water supply well for the Waterflood operation. Several Arbuckle locations have been identified and could, along with the horizontal Bartlesville producers, greatly increase the value of this field

above the present value.

(E). Capco's Offshore operations are summarized below;

(i) Offshore (GOM) Activities

(a) West Delta 62 Field, Federal Waters

This field was acquired in September 2006 making 4.2 mmcfd. Capco is the Operator and has a 24.17% working interest ("WI") in the well and the field. In January the well was shut down due to a sanding problem. Capco is attempting to return the well to production at present.

(b) Ship Shoal 144/145/159, Federal Waters

This field was acquired in September 2006 and contains three wells. Two wells are producing about 3.2 mmcfd. Capco is the Operator and has working interests varying from 10.9% to 18.125% in the wells and the field. This field has significant drilling potential. Two wells are planned for drilling at a gross cost of about $13.0 million (Capco's net share $1.4 million). The initial production from each well is expected to be about 11 mmcfd.

(c) West Cameron 102, Federal Waters

This field was acquired in September 2006 and was producing 5.2 mmcfd in August 2006. Capco is the Operator and has a 18.125% working interest. The well has since been shut down due to water encroachment problems. The pressures remain to be of economic capability.

(ii) Non Operated Fields, Federal Waters

Capco acquired interests in various non operated fields in Federal waters in September 2006. The net share of production for Capco is 50 bopd and 2,435 mcfd. The production is from the following fields:

1. EI 148, 44 and 45: Operated by Remington and Hellis. Capco's WI share, varying from 4% to 6%, is 10 bopd and 450 mcfd.
2. SS 167: Operated by Explore. Capco's 8% WI share is 14 bopd and 275 mcfd.

    3.    SP 26: Operated by Goodrich. Capco's 6% WI share is 22 bopd and 35 mcfd.
    4.    WC22/23: Operated by Newfield. Capco's 6% WI share is 1 bopd and 275 mcfd.
    5.    Brazos A-2: Operated by Hunt. Capco has a 12% WI. The well is shut in pending installation of a compressor. Capco expects its share of production to be 700 mcfd.
    6.    HI 282: Operated by LLOG. Capco's 6% WI share is 2 bopd and 450 mcfd.
    7.    HI A538: Operated by EPL. Capco's 8% WI share is 250 mcfd.
    8.    SS 52: Operated by LLOG

(iii) Brazos Field, Offshore Gulf Coast, Texas

Capco has varying interests ranging from 32% to 75% working interest in the Brazos Field which has 17 wells of which 3-4 are currently producing from one to two mmcfd's.

(iv) Chandeleur Area, St Bernard Parish, Louisiana

In the first quarter of 2005, Capco in conjunction with Hoactzin Partners, L.P. purchased 11 producing wells and approximately 13,300 gross acres in the South Chandeleur Area in the Gulf of Mexico and Louisiana State Waters. The working interests range from 14% to 100%.

(v) High Island 196, Gulf of Mexico, Federal Waters.

In the first quarter of 2005, Capco in conjunction with Hoatzin purchased 3 producing wells and approximately 5,000 gross acres in the High Island 196 Area in the Gulf of Mexico. The working interest purchased is 100%. Current production from these wells is approximately 2.2 mmcf.

**Emergency Motion of Debtor for Interim and Final Orders (I) Authorizing the Use of Cash Collateral Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Federal Rule Of Bankruptcy Procedure 4001(B), (II) Granting Adequate Protection to the Prepetition Secured Lender and (III) Scheduling and Approving Form and Manner of Notice of Final Hearing**

5.    The Debtors' creditors and liabilities are summarized as follows:

    A.    <u>Union Bank of California, N.A. ("UBOC")</u>. On or about August 31, 2006, UBOC, Capco Energy, Inc. and various Capco Energy, Inc. affiliates (Capco Energy, Inc. and affiliates collectively referred to as the "Capco Companies") executed a series of agreements and instruments (collectively, the "Loan

Documents") which, when taken together, provided for the extension of a revolving line of credit from UBOC to Capco secured by a security interest and/or lien against all of the assets of the Capco Companies, including without limitation, mortgages and/or deeds of trust against the oil and gas properties owned by such entities. One of the Loan Documents was a Credit Agreement which provided for UBOC to provide Capco Energy with a revolving line of credit, the limit of which was to be determined from time to time. The credit was extended through either funded advances or through letters of credit. The Credit Agreement called for an initial borrowing base in the amount of $31,000,000. Pursuant to the Credit Agreement, UBOC made funded advances under a line of credit to Capco in the amount of $27,750,000.00 and also extended a letter of credit in connection with such line of credit for the benefit of Capco in the amount of $3,250,000.00. The total outstanding liabilities to UBOC at the time of filing are approximately $13,700,000.00. Of that amount, approximately $3,700,000.00 is in the form of contingent liabilities under outstanding letters of credit issued to cover bonding obligations related to ongoing operations.

As security for funds advanced under the Credit Agreement, various Capco Companies executed Mortgages and Deeds of Trust which granted UBOC, among other things, (1) mortgages or deed of trust liens in oil and gas properties; (2) assignments of production; and (3) security interests in personal property.

Pursuant to the Loan Documents, UBOC also holds an interest in revenues generated by the Capco Companies' oil and gas properties (the "Properties"). The revenues constitute cash collateral of UBOC pursuant to 11 U.S.C. §363 (the "Cash Collateral")

B.   <u>Hoactzin, L.P. ("Hoactzin")</u>. Since the inception of the Debtors, Hoactzin has participated with the Debtors in the acquisition of various oil and gas properties. Hoactzin owns approximately $2,000,000.00 of subordinated debt of the Debtors. Hoactzin is also a party to an executory contract (the "Management Agreement" and various Amendments and Addendums) pursuant to which Hoactzin was to participate in the acquisition in 2006 of a block of offshore properties from Tana Exploration ("Tana'). The Debtors and Hoactzin are currently engaged in litigation arising out of the Tana acquisition and the Management Agreement.

C.   <u>Trade Debt</u>. In addition to the foregoing, as of the Petition Date, the Debtors collectively owe approximately Eight Million and no/100 Dollars ($8,000,000.00) to vendors and other third parties on recorded invoices. The largest single trade creditor is Nabors Industries, which has received a judgment in the approximate amount of $1,157,000.00.

6.   While preparing the emergency filing, the Debtors were in communications and negotiations with the Lender concerning an interim debtor-in-possession cash collateral

usage that should provide the Debtors with sufficient liquidity to make a smooth transition into chapter 11.

7.     Currently, the Debtors have no available cash or assets readily convertible to cash that are not subject to the Lender's liens and security interests.  As a result, the Debtors require, pursuant to Sections 105(a), 361, 362, and 363 of the Bankruptcy Code, the use of the Lender's cash collateral (the "Cash Collateral") to pay its necessary operating expenses, and to preserve and increase the value of its assets for the benefit of all creditors and parties-in-interest, including the Lender.

8.     If this Court approves the Debtors' use of Cash Collateral, the Debtors will be in a position to fund their operating expenses as a going concern for the immediate future until a determination can be made with respect to the longer term strategic alternatives. The Debtors need to use the Cash Collateral in order to, inter alia, fund payroll in order to satisfy employee obligations, pay vendors and suppliers and meet other on-going business obligations. Without the authority to use Cash Collateral, the Debtors will not be able to satisfy their payroll obligations or fund their business operations in a manner that will allow the Debtors to continue to operate as a going concern, all to the detriment of all creditors of the Debtors.

9.      A denial of the use of the Cash Collateral to fund the Debtors' continuing day-to-day operations would severely damage not only the Debtors and their current employees and customers, but also the Lender and other creditors of the Debtors. Further, the denial of the use of Cash Collateral will cause immediate and irreparable harm to the reputation, goodwill, and public confidence in the Debtors, a consequence that can only translate into a drastic loss of value as a going concern.

10.    Moreover, the Lender will benefit from approval of the request to use Cash Collateral because the Debtors can then move forward to preserve the Lender's collateral through a reorganization or sale of the Debtors' business.

11.    Perhaps most importantly, and in an effort to provide the Lender with a level of protection commensurate with the risk being taken by permitting the continued use of cash collateral in the midst of an uncertain outcome, the Debtors believe that the adequate protection being provided to the Lender, in the form of replacement liens, avoidance actions, a lien on the Debtors' intellectual property, and a superpriority claim pursuant to Section 364 (c)(1) of the Bankruptcy Code is necessary and represents the sound business judgment of the Debtors.

**Conclusion**

12.    The Debtors hope to confirm a plan of reorganization and emerge from Chapter 11 in as short a time as is necessary.  The Debtors believe that the protections afforded by Chapter 11 will enable them to develop, implement and consummate a financial restructuring that will provide for the equitable treatment of all claims and interests, and

preserve the value of their assets for the benefit of creditors and equity security holders alike.

Further Affiant Sayeth Naught.

Signed this 4 day of April 2008.

_____
Mike Myers

Subscribed and sworn to before me this 4th day of April, 2008.

_Carla Petty_
(Notary Public Signature)

_Carla Petty_
(Notary Public Printed or Typed Name)
My commission expires: 12-14-11

(Notary Seal)

CARLA PETTY
My Commission Expires
December 14, 2011